IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| JEVIC HOLDING CORP., et al., | ) | Bk. No. 08-11006 (BLS) |
| | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| CASIMIR CZYZEWSKI, et al., | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | Civ. No. 13-1127-SLR |
| | ) | |
| SUN CAPITAL PARTNERS, INC., | ) | |
| | ) | |
| Appellee. | ) | |

**MEMORANDUM**

At Wilmington this 29th day of September, 2014, having reviewed the appeal taken by Casimir Czyzewski, Melvin L. Myers, Jeffrey Oehlers, Arthur E. Perigard, and Daniel C. Richards ("appellants"),[1] and the papers submitted in connection therewith; the court issues its decision based on the following analysis:

1. **Background.**[2] Jevic Transportation Inc. ("Jevic"), Jevic Holding Corp. ("Jevic

---

[1] Appellants are former employees of Jevic Transportation. Jevic Transportation, Inc. ("Jevic") began operations in 1981 and provided a hybrid less-than-truckload and truckload carrier service for regional and inter-regional time-definite-delivery across the United States and parts of Canada. Prior to filing for bankruptcy, Jevic employed approximately 1,785 employees and was headquartered in Delanco, New Jersey.

[2] The factual background is largely undisputed and is taken from the United States Bankruptcy Court for the District of Delaware's ("bankruptcy court") opinion dated May 10, 2013 and supplemented by the parties' briefing. *See In re Jevic Holding Corp.*, 492 B.R. 416 (Bankr. D. Del. 2013).

Holding"),[3] and Creek Road Properties, LLC[4] (collectively, "debtors") are a trucking company. Jevic had an initial public offering in 1997 and was acquired by Yellow Corporation in 1999. In 2002, Yellow Corporation spun off Jevic and its sister company, Saia Motor Freight Line, to form SCS Transportation. Starting in 2006, a nationwide decline in freight volumes led to a decline in debtors' revenue. SCS evaluated alternatives for Jevic, including a sale or liquidation, and contemplated filing for bankruptcy.

2. On June 30, 2006, Sun Transportation, LLC ("Sun Transportation"), a wholly-owned subsidiary of Sun Capital Partners, Inc. ("appellee"), acquired Jevic from Saia Motor Freight Line and SCS Transportation in a leveraged buyout. (D.I. 17 at 4) The buyout included an $85 million revolving credit facility from a bank group led by CIT Group/Business Credit, Inc. ("CIT"). CIT's financing agreement required the debtors to maintain assets and collateral of at least $5 million in order to access its line of credit. Appellee, through Sun Transportation, paid $1 million to Jevic Holding, which was created for the acquisition of all of Jevic's shares.

3. Upon the merger, Jevic and appellee entered into a Management Services Agreement, which governed the relationship between appellee and Jevic and provided for consulting services and compensation for such services. By the end of 2007, the debtors' assets fell below $5 million, in default of CIT's financing covenant. CIT and the debtors entered into a forbearance agreement that went into effect on January 8, 2008.

---

[3] Jevic Holding had no independent operations, but owned 100% of the issued and outstanding stock of Jevic.

[4] Creek Road Properties held no assets and had no operations.

Under the agreement, appellee provided a $2 million guarantee. Appellee also negotiated further forbearance extensions through April 2008.

4. In March 2008, appellee chose not to invest more money in Jevic and Jevic began an active sale process. Although Jevic retained consulting services and implemented a reorganization plan with the intention of realizing substantial monthly savings and maintaining asset values above $5 million, by the end of April, Jevic's assets again fell below $5 million, in default of CIT's financing covenant. After meetings with two potential buyers did not lead to a sale, Jevic's board formally authorized a bankruptcy filing on May 16, 2008. Jevic sent its employees termination notices pursuant to the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). The notices were received on May 19, 2008.

5. On May 20, 2008, debtors filed a voluntary petition for relief in the bankruptcy court under Chapter 11 of Title 11 of the Bankruptcy Code. On May 21, 2008, appellants filed a complaint alleging WARN Act and New Jersey Millville Dallas Airmotive Plant Job Loss Notification Act, PL.2007, c.212, C.34:21-2 ("New Jersey WARN Act") violations for failing to provide employees with the requisite 60-day notice before a plant closing or mass layoff. On December 10, 2008, the bankruptcy court certified the WARN class and directed the named appellants as the class representatives.

6. Discovery began in mid-2008 and ended on September 7, 2012. (D.I. 17 at 4) During discovery, appellants took the depositions of twelve individuals affiliated with

Sun entities,[5] the debtors and non-parties. *Id.* On June 29, 2012, appellants noticed the depositions of appellee's co-CEOs Rodger Krouse and Marc Leder. *Id.* Appellee moved for a protective order because Mr. Krouse and Mr. Leder did not have personal or unique knowledge of the employment practices at issue. *Id.* The bankruptcy court accordingly quashed appellants' deposition notices. *Id.*

7. On September 26, 2012 and October 15, 2012, respectively, appellee and appellants filed motions for summary judgment on the issue of whether appellee could be held liable for any WARN Act violations as a "single employer." *Id.* On May 10, 2013, Judge Brendan L. Shannon issued a Memorandum Opinion and Order granting appellee's motion for summary judgment and denying appellants' motion for summary judgment, holding that appellee was not a "single employer" for purposes of appellants' claims under the WARN Act and the New Jersey WARN Act. (08-11006-BLS, D.I. 240, 241, 242, 243) On June 24, 2013, appellants filed a timely notice of appeal. (D.I. 1)

8. **Standard of Review.** This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact[6] and a plenary standard to that court's legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). With

---

[5] Appellee notes these are non-defendant Sun entities, which include Sun Transportation, Fund IV, Sun Management and Sun Advisors.

[6] "A factual finding is clearly erroneous when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *In re CellNet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

4

mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101–02 (3d Cir. 1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo basis bankruptcy court opinions. *In re Hechinger*, 298 F.3d 219, 224 (3d Cir. 2002); *In re Telegroup*, 281 F.3d 133, 136 (3d Cir. 2002).

9. Decisions regarding discovery management and the scope of discovery are discretionary and reviewed under an abuse of discretion standard. *In re Kiwi International Air Lines, Inc.*, 344 F.3d 311, 323 (3d Cir. 2003); *In re Mazzocone*, 200 B.R. 568, 573 (E.D. Pa. 1996).

10. **Analysis.** By this appeal, appellants contend: (1) the bankruptcy court erred in finding that appellee was not a "single employer" under the WARN Act;[7] and (2) the bankruptcy court incorrectly granted appellee's motion for a protective order to quash the subpoenas of appellee's co-CEOs, Rodger Krouse and Marc Leder. (D.I. 14

---

[7] The WARN Act provides that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to each affected employee. 29 U.S.C. § 2101(a)(1). It defines an "employer" as "any business enterprise" that employs "100 or more employees." 29 U.S.C. § 2101(a)(1). "Independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as . . . a part of the parent or contracting company depending upon the degree of their independence from the parent." 20 C.F.R. § 639.3(a)(2).

at 1) With respect to the first contention, appellants may recover damages for unnoticed plant closings if they can establish that appellee was a single "business enterprise" or single employer with Jevic. *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 (3d Cir. 2001).

11. The standard for inter-corporate liability under the WARN Act rests on whether the relevant companies have become "so entangled with [one another's] affairs" that the separate companies "are not what they appear to be, [and] in truth they are but divisions or departments of a single enterprise." *NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1122 (3d Cir.1982). The Department of Labor ("DOL") has explicitly promulgated relevant factors for courts to use when considering whether to impose derivative liability under the WARN Act on an affiliated corporation: (1) common ownership; (2) common directors and/or officers; (3) de facto exercise of control; (4) unity of personnel policies; and (5) dependency of operations. *See* 20 C.F.R. § 639.3(a)(2).[8] These DOL factors are similar to those of the "single entity" analysis under the federal alter ego test, but conflicts within existing case law have resulted in various jurisdictions applying slightly different tests for liability under the WARN Act. *Pearson*, 247 F.3d at 477.

12. In *Pearson*, a suit brought by employees against an employer's creditor for damages under the WARN Act for the employer's unnoticed plants closures, the Third

---

[8]As noted by the bankruptcy court, the analysis under the WARN Act and the New Jersey WARN Act are substantially similar. *See DeRosa v. Accredited Home Lenders, Inc.*, 420 N.J. Super. 438 (Ct. App. Div. 2011) (adopting the five-factor DOL test to determine "single employer" liability for New Jersey WARN Act purposes). The model for the New Jersey WARN Act was its federal counterpart. *Id.* at 36.

6

Circuit concluded that the appropriate test for corporate veil piercing under the WARN Act consists of the DOL factors. *Id.* at 478 ("The DOL's instruction that courts apply 'existing law' was not intended to undermine the force of its own regulation on the subject, but was instead intended to instruct courts that existing precedent applying other tests . . . may be useful and appropriate to resolve analogous questions arising under the WARN Act."). The factors, however, "are not balanced equally: the first and second factors, common ownership and common directors and/or officers, are not sufficient to establish that two entities are a single employer." *In re APA Transport Corp. Consol. Litig.*, 541 F.3d 233, 243 (3d Cir. 2008) (citing *Pearson*, 247 F.3d at 494).

13. Appellee does not contest the bankruptcy court's finding regarding the "common ownership" factor, which is satisfied in that appellee is a "direct parent corporation of the Debtors." *In re Jevic Holding Corp.*, 492 B.R. 416, 425 (Bankr. D. Del. 2013). Nor does appellee contest the bankruptcy court's finding regarding the "common directors and/or officers" factor, which is satisfied by the presence of two common members on the formal management teams of Jevic and appellee. *Id.* at 425-26. The parties focus their arguments on the bankruptcy court's finding that the remaining three factors – unity of personnel policies, dependency of operations, and de facto exercise of control – "weigh strongly in favor of finding no 'single employer' liability." *Id.* at 425.

14. The relevant question for WARN Act liability under the "de facto control" prong is "whether the parent has specifically directed the allegedly illegal employment practice that forms the basis for the litigation." *Pearson*, 247 F.3d at 491; *see also In re*

7

*APA*, 541 F.3d at 245 ("The core of this factor is whether one company 'was the decision-maker responsible for the employment practice giving rise to the litigation.'") (citation omitted). This factor is "not intended to support liability based on a parent's exercise of control pursuant to the ordinary incidents of stock ownership." *Pearson*, 247 F.3d at 503.

15. In laying the groundwork for their argument, appellants draw a distinction between "decision maker" and "direction giver." (D.I. 14 at 5) Appellants reason that even though appellee did not direct the plant closure, appellee's decision to withhold funding directly caused the closure. (D.I. 14 at 5) However, the *Pearson* court cautions against using this type of "natural and probable consequences" reasoning, instead directing the factfinder to ask who retains "the ultimate responsibility for keeping the company alive." *Pearson*, 247 F.3d at 505. For the reasons that follow, the court finds that the ultimate responsibility belonged to Jevic, not appellee.

16. In support of their argument that appellee maintained ultimate control of Jevic, appellants point to the fact that two of appellee's representatives also sat on Jevic's board. (D.I. 14 at 6) Appellants accuse the board of being a sham, bereft of meaningful action with the exception of signing the Chapter 11 authorization. (D.I. 14 at 6, 8) Appellants argue that the lack of formal approval of financing agreements by Jevic's board is evidence that Sun single-handedly controlled Jevic's financing. (D.I. 14 at 7) As further evidence of financial dependence, appellants assert that Jevic's supposedly autonomous actions, such as hiring independent financial researchers, retaining investment bankers and negotiating with potential buyers, were instead the

8

fruits of negotiation, suggestion and general interference on the part of appellee. (D.I. 14 at 10-12)

17. The court agrees with the bankruptcy court that any alleged oversight during the process leading up to filing for bankruptcy is "significantly lower than in *Pearson*" where the indebted party was required to seek approval for many of its decisions. *In re Jevic*, 492 B.R. at 428.[9] Regardless of any alleged informal interference with Jevic's financial decision-making, it remains undisputed that "the Debtors made the decisions to shut down the company." *Id.* at 429. Moreover, Jevic was directly responsible for signing the WARN notice and terminating employees. *Id.* Therefore, the bankruptcy court appropriately found that appellee's "decision to cut off funding was not a 'de facto exercise of control' over the Debtor's decision to close its doors." *Id.*

18. As interpreted by the Third Circuit, the "unity of personnel policies" prong "require[s] the factfinder to focus the inquiry less on the hierarchical relationship between the companies . . . than on whether the companies actually functioned as a single entity with regard to its relationships with employees." *Pearson*, 247 F.3d at 499. The Third Circuit directs the factfinder to consider "whether the two companies in question engaged in centralized hiring and firing, payment of wages, and personnel and benefits recordkeeping." *In re APA*, 541 F.3d at 245.

---

[9] The court does not agree with appellants' argument that the presence of two of appellee's' employees on Jevic's board of directors is evidence of de facto control. *See In re Consol. Bedding, Inc.*, 432 B.R. 115, 122 (Bankr. D. Del. 2010) (absent a showing that shared directors retained their original allegiance while making difficult decisions for the debtors, mere service on both boards does not show de facto control).

9

19. Appellants argue that "unity of personnel policies" exists because appellee and Jevic shared a healthcare initiative, business insurance and incentive programs for management.[10] (D.I. 14 at 12-13, 17) Specifically, appellants argue that Jevic intended to join appellee's healthcare initiative in the future, though they concede that Jevic stayed with its own insurer "through the end." (D.I. 14 at 13) Appellants also allege that appellee's insurance policies provided Jevic with coverage and that appellee maintained a "managerial interest" in Jevic's policies.[11] (D.I. 14 at 12) Additionally, appellants contend that appellee's co-Chief Executive Officers scrutinized and directed personnel issues at Jevic in a routine and detailed manner by making personnel decisions a condition of funding, establishing incentive programs, setting up an option pool of stock for upper management and supporting headcount reductions.[12] (D.I. 14 at 17-19) Appellants emphasize the fact that Jevic's CEO received a "best practices" kit from appellee and that Jevic's CFO attended an appellee-run training conference. (D.I. 14 at 17-18)

20. With regard to the healthcare initiative, the record is clear that Jevic steadfastly maintained its own healthcare insurer regardless of any purported intent to

---

[10] Throughout their briefs, appellants use facts from a First Circuit case, *Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129 (1st Cir. 2013), as a basis for various assertions about appellee's generalized business practices. The court does not take notice of these facts.

[11] Appellee contests appellants' characterization of the insurance policy, arguing that a Sun entity merely "introduced" Jevic to an insurance broker. (D.I. 17 at 13)

[12] Appellee argues that Jevic Holding's board, not a Sun entity, adopted the stock option plan. (D.I. 17 at 14) Appellee also maintains that any support for headcount reductions came in the form of consultation services per the terms of the parties' agreement. *Id.*

switch insurers in the future. To the extent that there are inconsistencies in the record about the nature of the business insurance coverage, the existence of incentive programs and stock options, and the extent of employee monitoring, the court is not persuaded that these programs, on their own, are enough to create a genuine issue of material fact with respect to unity of personnel policies. *See In re APA*, 541 F.3d at 245 (holding that sharing certain benefit plans and some employee monitoring functions is insufficient to support a finding that the companies functioned as a single entity). Regarding the "best practices" kit and the training conference, the court agrees with the bankruptcy court that these isolated instances of interaction do "not rise to the level of integrated personnel policies contemplated in this factor." *In re Jevic*, 492 B.R. at 430. Ultimately, appellants failed to produce evidence that appellee **directly** hired or fired Jevic employees, paid the salaries of Jevic employees or shared a personnel or benefits recordkeeping system with Jevic. The court concludes that appellants have not created a genuine issue of fact as to the existence of a unified personnel policy, and this factor was correctly decided in the appellee's favor.

21. Under the "dependency of operations" factor, the Third Circuit considers "the existence of arrangements such as the sharing of administrative or purchasing services, interchanges of employees or equipment, and commingling finances." *Pearson*, 247 F.3d at 500 (citations omitted). This factor "cannot be established by the parent corporation's exercise of its ordinary powers of ownership." *Pearson*, 247 F.3d at 501.

22. Appellants argue that appellee exceeded the ordinary powers of ownership by implementing a plan to restructure Jevic for profit. (D.I. 14 at 14) Specifically,

appellants assert that a representative of appellee worked together with an independent contractor to implement a restructuring plan in which they instituted accounts and managed costs. (D.I. 14 at 18) Appellants also argue that appellee immersed itself in the details of Jevic's management by putting into place a Management Services Agreement and then exacting fees for those management services. (D.I. 14 at 14-15)

23. Appellee responds that the restructuring plan was the product of an agreement between Jevic and an independent consulting firm, in which the consulting firm would provide "advice and recommendations to the Company . . . on restructuring matters." (D.I. 17 at 17) Appellee adds that any decision-making power concerning restructuring was limited by the terms of the consulting agreement, which stated that "[f]inal decision-making authority shall remain at all times with [Jevic]." *Id*. Appellee argues that the Management Services Agreement, which was negotiated at "arms length," explicitly states that the "activities of [Jevic] shall at all times be subject to the control and direction of its directors and officers." (D.I. 17 at 15); *In re Jevic*, 492 B.R. at 432.

24. The court agrees with the bankruptcy court that "[i]t is undisputed that Jevic maintained separate books and records, had its own bank accounts, and prepared its own financial statements." *Id*. The court also agrees that it is "undisputed that Jevic did not share administrative services, facilities, or equipment with [appellee]." *Id*. Moreover, the court is persuaded that appellee acted as an "independent contractor" as per the terms of the Management Services Agreement, providing management consulting services in exchange for monetary compensation. (D.I. 17 at 16) To the extent that these services included advice on restructuring, there is insufficient evidence

12

that appellee yielded the type of control and day-to-day involvement sufficient to show a "dependency of operations" giving rise to liability. See Pearson, 247 F.3d at 501 ("dependency of operations cannot be established by the parent corporation's exercise of its ordinary powers of ownership, i.e. . . . to set general policies.").

25. As a final matter, appellants contest the bankruptcy court's decision to quash the subpeonas for the depositions of Rodger R. Krouse and Marc J. Leder, appellee's co-Chief Executive Officers. (D.I. 14 at 19) Appellants contend that the two witnesses "had particularized and specific knowledge of [appellee's] business practices and the critical interactions and decisions that are the focus of this litigation." (D.I. 14 at 20)

26. When determining whether the deposition of a high-ranking corporate officer is appropriate, courts in this circuit consider: "(1) whether the executive or top-level employee has personal or unique knowledge on relevant subject matters; and (2) whether the information sought can 'be obtained from lower[-]level employees or through less burdensome means, such as interrogatories.'" Ford Motor Co. v. Edgewood Properties, Inc., 2011 WL 677331 at *2 (D.N.J. Feb. 15, 2011) (citation omitted). The bankruptcy court's decision is supported by the absence of any dispute that appellee decided not to fund Jevic as well as by declarations by Mr. Krouse and Mr. Leder denying any involvement in the disputed management decisions. (D.I. 17 at 19-20) The court therefore concludes that the bankruptcy court acted within its discretion in quashing the subpoenas.

27. **Conclusion**. For the reasons discussed above, the bankruptcy court's decision is affirmed and the appeal therefrom is denied. An order shall issue.

                                                                                                         United States District Judge